1

2

3

4

IN THE UNITED STATES DISTRICT COURT

5

FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7

MOUANG SAECHAO, individually and
on behalf of all others similarly situated,

No. C 15-00815 WHA

8

9

Plaintiff,

10

v.

11

LANDRY'S INC, a Delaware corporation,
and McCORMICK & SCHMICK
RESTAURANT CORP., a Delaware
corporation,

**ORDER GRANTING IN PART
AND DENYING IN PART
PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION**

12

13

Defendants.

14

_____/

15

**INTRODUCTION**

16

In this wage-and-hour putative class action, plaintiff seeks to certify five classes. For

17

the reasons stated below, plaintiff's motion is **GRANTED IN PART AND DENIED IN PART**.

18

**STATEMENT**

19

Plaintiff Mouang Saechao worked as a host and banquet server at Spenger's Fresh Fish

20

Grotto in Berkeley, a restaurant owned and operated by defendant McCormick & Schmick

21

Restaurant Corporation, from November 2013 to December 2014 (Saechao Dep. at 11). At all

22

relevant times, McCormick & Schmick employed the workers at Spenger's.

23

Hourly workers at Spenger's clocked in and out at a computerized point-of-sale system

24

at the start and end of shifts and the start and end of any meal breaks. The computer system

25

used at Spenger's did not record rest breaks (which were compensated). McCormick &

26

Schmick determined employees' wages based on the records in the computerized system,

27

although managers could submit "adjustment forms" to manually adjust wages as needed.

28

United States District Court
For the Northern District of California

1    Saechao seeks to certify five classes of employees and former employees at Spenger's

2    each to assert a claim based on a different uniform policy or practice enforced by McCormick &

3    Schmick.  Saechao's first proposed class asserts a claim for unpaid premium wages for shifts

4    during which employees were improperly denied an unpaid thirty-minute meal break.  Her

5    second proposed class asserts a claim for unpaid premium wages for shifts during which

6    employees were improperly denied a paid ten-minute rest break.  Her third proposed class

7    asserts a claim for unpaid premium wages for split shifts (that is, consecutive shifts on the same

8    day separated by more than sixty minutes).  Her fourth proposed class asserts a claim for

9    statutory penalties arising out of McCormick & Schmick's failure to timely pay the premium

10   wages allegedly owed to the first three classes to individuals who quit or had their employment

11   terminated.  Her fifth proposed class asserts a claim for statutory penalties for McCormick &

12   Schmick's use of an improper format of wage statements.  This order follows full briefing and

13   oral argument.

14                                        **ANALYSIS**

15   Class certification is appropriate when a plaintiff can show that all of the prerequisites of

16   Rule 23(a) and one of the requirements of Rule 23(b) has been met.  *Abdullah v. United States*

17   *Security Associates, Inc.*, 731 F.3d 952, 956–57 (9th Cir. 2013).  Rule 23 considers whether

18   "(1) the class is so numerous that joinder of all members is impracticable; (2) there are

19   questions of law or fact common to the class; (3) the claims or defenses of the representative

20   parties are typical of the claims or defenses of the class; and (4) the representative parties will

21   fairly and adequately protect the interests of the class."  Saechao seeks certification under Rule

22   23(b)(3), which requires her to show that "questions of law or fact common to class members

23   predominate over any questions affecting only individual members, and that a class action is

24   superior to other available methods for fairly and efficiently adjudicating the controversy."

25   Under Rule 23(a)(1), numerosity is satisfied by showing that "joinder of all members is

26   impracticable."  This prerequisite is not tied to any fixed numerical threshold but is generally

27   satisfied "when a class includes at least forty members."  *Rannis v. Recchia*, 380 Fed. Appx.

28                                           2

United States District Court

For the Northern District of California

646, 650 (9th Cir. 2010). Here, the smallest proposed class (split shifts) has at least sixty-five members. Thus, the numerosity requirement of Rule 23(a)(1) is met. (McCormick & Schmick does not dispute this conclusion.)

Additionally, as discussed in greater detail with regard to the predominance of common issues, Saechao has demonstrated that numerous questions of law and fact are common to each proposed class. In particular, the evaluation of the nature and scope of each of the challenged policies and practices (and the validity thereof) will be common to the class. Thus, Rule 23(a)(2), which only requires the presence of at least one significant question common to each class, is met. *See Abdullah v. United States Security Associates, Inc.*, 731 F. 3d 952, 956 (9th Cir. 2013). (McCormick also does not dispute the existence of a single question common to each proposed class.) This order now turns to the disputed requirements for class certification.

McCormick & Schmick's primary argument is that common questions do not *predominate* over individualized questions, as required for certification under Rule 23(b)(3). McCormick & Schmick also argues that Saechao's claims are not typical of the claims of the putative class members, as required by Rule 23(a)(3), and that she is an inadequate representative of the class under Rule 23(a)(4). McCormick & Schmick also argues that Saechao's counsel are inadequate to serve as class counsel.

This order first addresses the policies and practices that Saechao seeks to challenge and issues of predominance and typicality as they relate to each. It then addresses the adequacy of Saechao as a class representative and her counsel as class counsel, which considerations relate to the case as a whole. Next, this order turns to a brief discussion of the superiority of class litigation to other methods of resolving the claims herein. Finally, this order addresses several evidentiary issues raised by both sides.

## 1. PREDOMINANCE AND TYPICALITY.

### A. Meal Breaks.

Section 512(a) of the California Labor Code sets forth the requirements for the provision of a meal break during a work period:

> An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee.

Paragraph 11(B) of IWC Wage Order 5-2001 requires an employer to pay premium wages for meal periods it fails to provide:

> If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this Order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the meal period is not provided.

Until December 2011, McCormick & Schmick presented new employees at Spenger's with written stand-alone forms asking employees to waive their rights to meal breaks during shifts between five and six hours long (Cohorn Decl., Exh. Y). In 2012, McCormick & Schmick replaced the stand-alone meal-break waiver with a waiver incorporated into the "General Information Form" presented to new employees, including Saechao, at their orientation. The meal-break waiver portion of the form, which included substantially the same information as the previous stand-alone form, is reproduced below (Jasso Dep., Exh. 231 at SPENGERS006044):



**Meal Period Waiver (CA restaurants only):** By checking and signing below, I hereby voluntarily agree to: (check the applicable boxes)

☐ Waive my right to a 30 minute meal period whenever I work over five 5 hours in a day and no more than 6 hours total in a day.

☐ Waive my right to a 2nd 30 minute meal period whenever I work over 10 hours but not more than 12 hours in a day. I understand that the 2nd meal period may be waived only if I received the 1st meal period. I understand that, as a result of this waiver, I will receive only one meal period when I work more than 10 hours but not more than 12 hours in a day.

☐ I understand that I may revoke this "Meal Period Waiver" at any time by notifying my manager before my shift begins. Unless revoked, this waiver will remain in effect.

In June 2015, McCormick & Schmick began using a new stand-alone form to obtain meal-break waivers (Cohorn Decl., Exh. J). That form included a brief description of applicable California law, in addition to the information provided on the previous waiver forms.

4

United States District Court

For the Northern District of California

1    McCormick & Schmick did not pay premium wages to employees that signed those

2    waivers for shifts between five and six hours long during which an employee did not take a full

3    thirty-minute meal break (or missed a meal break altogether).

4        Saechao concedes that she and many other employees at Spenger's signed meal-break

5    waivers at the start of their employment.  Saechao's claim is that the meal-break waivers that

6    she and her colleagues signed were facially invalid under California law, so McCormick &

7    Schmick could not rely on those waivers when failing to pay premium wages whenever an

8    employee missed a meal break.

9        Specifically, Saechao contends that California law forbids prospective blanket waivers

10   of meal breaks and that only waivers obtained on a shift-by-shift basis can immunize

11   McCormick & Schmick from paying premium wages for shifts in which an employee took no

12   meal break (or took a meal break shorter than thirty minutes).  Saechao further contends that

13   even if California law permits prospective blanket meal-break waivers, the particular form of

14   the waivers at issue here precluded employees from understanding the effect of the waivers (and

15   thereby consenting to the waiver) inasmuch as the form lacked any explanation of the legal

16   rights for which McCormick & Schmick sought a waiver.

17       Saechao primarily relies on an opinion letter allegedly issued by the California Division

18   of Labor Standards Enforcement on August 13, 2003.  That letter provides, in pertinent part

19   (Chao Decl., Exh. 1):

20               As a statutorily protected right, the decision to forego a meal
                 period must be made personally by each worker on a daily basis.
21               The decision to forego a meal period may not, therefore, be based
                 on a specific requirement of the employer or on a policy or
22               practice which could reasonably be perceived to be a condition of
                 employment.  Therefore, blanket "waivers" of meal periods
23               . . . will not be considered valid.

24   Ordinarily, DLSE opinion letters "while not controlling upon the courts by reason of their

25   authority, do constitute a body of experience and informed judgment to which courts and

26   litigants may properly resort for guidance."  *Seymore v. Metson Marine, Inc.*, 194 Cal. App. 4th

27   361, 369 n.5 (2011).  Here, however, McCormick & Schmick disputes the authority of the cited

28
                                          5

United States District Court

For the Northern District of California

DLSE letter inasmuch as it does not appear on DLSE's list of issued opinion letters. (Nor does it appear on the list of withdrawn letters.)[1]

McCormick & Schmick responds that its meal-break waiver forms were facially lawful because they were voluntary and revocable. Thus, McCormick & Schmick argues, Saechao's theory fails as a matter of law. The only authority cited is a district court decision that only tangentially addressed the issue in a dicutm. In *Lewis v. Wendy's International, Inc.*, No. 09-07193, 2010 U.S. Dist. LEXIS 144164, at *27–28 (Mar. 24, 2010) (Judge Margaret M. Morrow), the plaintiff contended that his employer enforced a voluntary and prospective meal-break waiver form to require him to skip meal breaks. That decision dismissed the plaintiff's claim that his employer forced him to skip meal breaks by enforcing the waiver form because the plaintiff failed to allege that he signed the form in the first place. After so holding, the decision noted that a voluntary and revocable waiver form could not form the basis of such a claim absent evidence that the employer imposed a *de facto* policy requiring employees to sign the waiver or preventing revocation thereof.

Although *Lewis* described the meal-break waiver therein as "facially appropriate," it did not address the prospective nature of the form. Nor did either side address that issue in their briefs in that case. McCormick & Schmick may ultimately rely on *Lewis* as persuasive authority once our case turns to the merits, but at this stage, a dictum in a non-binding decision does not bar at the threshold Saechao's argument that the common question of the validity of McCormick & Schmick's meal-break waiver policy is a predominant question for that proposed class.

---

[1] Saechao also cites *Valenzuela v. Guimarra Vineyards Corp.*, 614 F. Supp. 2d 1089, 1095 (E.D. Cal. 2009), for the position that blanket waivers of meal periods are invalid. That decision held that employees must provide a meal break for shifts longer than five hours. It did not address the issue of prospective blanket waivers. The language that Saechao excerpts in her citation to *Valenzuela* appeared in that decision's reproduction of the same DLSE letter addressed above. Nevertheless, the validity of prospective blanket meal-break waivers, which both sides agree is not settled law, is best resolved on the merits on a class-wide basis.

United States District Court

For the Northern District of California

The common questions advanced for certification need not necessarily be questions that will be resolved in favor of the class. At this stage, Saechao need only show that there is a bona fide question capable of class-wide resolution. *See Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015). Whether or not California law permits an employer to utilize prospective meal-break waivers remains an open question which can plainly be resolved on a class-wide basis.

Saechao also advances an alternative theory of liability. She contends that even if California law permits prospective blanket meal-break waivers, the employees at Spenger's could not have voluntarily consented to the waiver inasmuch as the form of the waiver did not adequately convey its effect. That is, Saechao contends that because the waiver failed to explain each employee's rights under California law, no employee could have made a knowing waiver as a matter of law.

McCormick & Schmick responds that Saechao's alternative theory predominantly relies on individual questions regarding each employee's understanding of the effect of the meal-break waiver, but McCormick & Schmick mischaracterizes Saechao's theory. Saechao's alternative theory, like her primary theory, turns on the facial validity of the meal-break waiver form — a question of law capable of resolution on a class-wide basis. This theory will necessarily presuppose that class members understood some or all of their rights and the question will boil down to whether they had to be "Mirandized" anyway before the waiver could be effective. This theory does not rely on individual questions regarding employees' intent to waive individual meal breaks.[2]

Here, the class will only comprise hourly employees at Spenger's who signed McCormick & Schmick's meal-break waiver and for whom McCormick & Schmick declined to

---

[2] McCormick & Schmick also cites *In re Walgreen Co. Overtime Cases*, 231 Cal. App. 4th 437, 442 (2014), for the position that classes based on meal-break claims are difficult to certify because any missed meal break requires an individualized inquiry into the reason the worker missed the break before determining liability. The California Supreme Court ordered that decision de-published, so it cannot be relied upon as precedent pursuant to California Rule of Court 8.1115(a). *In re Walgreen Co. Overtime Cases*, No. S223001, 2015 Cal. LEXIS 968 (Feb. 18, 2015).

pay premium wages for shifts without full meal breaks.  Thus, the presumed reason a member of the class missed a meal break without receiving premium wages was the enforcement of the meal-break waiver.  If McCormick & Schmick contends that some of the missed meal breaks were in fact waived on a shift-by-shift-basis, its failure to record such breaks due to its reliance on the challenged policy is its own fault.

Individual damages can be easily calculated using a common method of proof, that is, by reference to McCormick & Schmick's time sheets — if the meal-break waivers are invalid, employees are entitled to damages for any shift between five and six hours during which no thirty-minute meal break is recorded.  Damages for each such shift will be one hour of pay at the employee's regular rate of compensation, which can be determined from each employee's wage statements.

Turning to typicality, McCormick & Schmick contends that Saechao's meal-break claims are not typical of those of the putative class because she only worked at Spenger's for a year and only in the positions of host and banquet server.  Moreover, employees hired after June 2015 (after Saechao had left Spenger's) signed a form that differed substantially from the form Saechao signed.

As to the duration of Saechao's employment and the positions that she held, these are distinctions without differences.  McCormick & Schmick's meal-break policy applied equally to every employee who signed a waiver form, regardless of the duration of her employment or her job title.  The limited scope of Saechao's experience does not alter the typicality of her claims.

The fact that the meal-break waiver form changed significantly in June 2015, by including a discussion of relevant California law, poses a more serious problem, inasmuch as Saechao cannot pursue claims that are not identical or substantially similar to her own.  Nevertheless, this order need not address that issue because the class period will be cut off as of the date Saechao filed this action — February 23, 2015 — so the new meal-break waivers will play no role in this action.

8

United States District Court

For the Northern District of California

**B.      Rest Breaks.**

Paragraph 12 of IWC Wage Order No. 5-2001 provides, in pertinent part:

> (A)  Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period.  The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof.  However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 ½) hours.  Authorized rest period time shall be counted as hours worked, for which there shall be no deduction from wages.

> (B)  If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this Order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the rest period is not provided.

At all relevant times, McCormick & Schmick had a uniform practice regarding rest breaks.  McCormick & Schmick codified the practice in written form in June 2015, but all agree that the written policy reflected the practice already in place (Jasso Dep. at 93; Villarreal Dep. at 191).  The written policy provided, in pertinent part (Jasso Dep., Exh. 209 at SPENGERS006746):

> California law requires that employers authorize and permit 10-minute paid rest breaks every 4 hours or major fraction thereof.  Rest breaks should be taken approximately half way through each 4-hour work break subject to business needs, however, always in accordance with the law.

> ***

> If I am unable to take a rest or meal break as discussed above, I agree that I will inform my supervisor at the time the rest or meal break should have been taken, or as soon thereafter as possible.  If I fail to inform my manager that I missed a meal or rest break and/or that my meal break was interrupted or otherwise fails to satisfy the requirements above, the failure to inform my supervisor can and will be interpreted as a voluntary waiver of that meal or rest break.

Management at Spenger's took no affirmative steps to relieve employees for ten-minute rest breaks, and only became aware of missed rest breaks (and therefore any liability for premium wages) if an employee informed the supervisor of a missed break of her own initiative.

United States District Court

For the Northern District of California

Management did not consider the need for rest breaks in making staffing decisions. The computerized timekeeping systems did not record rest breaks, although managers could manually adjust records to pay premium wages. No manager could recall arranging for an employee to receive such premium wages (Villarreal Dep. at 200; Jones Dep. at 91; Tafoya Dep. at 96).

Saechao's theory of liability is that McCormick & Schmick's practice of placing the burden on each employee to affirmatively take rest breaks or inform their supervisor any time a rest break could not be taken did not satisfy McCormick & Schmick's duty to "provide" a rest break within the meaning of the wage order. As with her meal-break waiver class, her rest-break class relies on a facial challenge to McCormick & Schmick's practice, which is a legal question plainly capable of class-wide resolution.

As with the meal-break waiver class, the rest-break class will require an individualized damages analysis. Damages will not be as easily calculated as the meal-break waiver, inasmuch as McCormick & Schmick neither recorded rest breaks nor missed rest breaks, so there is no way to discern which particular shifts warrant premium pay for missed rest breaks from payroll records. Nevertheless, if the practice is found illegal, a claims process, through which class members submit specific sworn evidence indicating which shifts McCormick & Schmick failed to adequately provide a rest break will be manageable and superior to dozens of individual lawsuits regarding this practice.

In the interest of efficiency and in order to bring any additional individualized issues to the attention of the Court at the outset, the class notice will instruct any class member seeking compensation for missed rest breaks to submit evidence of his or her entitlement thereto. Class members should submit sworn statements stating the date of each shift during which they could not take a rest break and the circumstances that prevented them from taking such breaks. If class members cannot recall the specific dates of the missed rest breaks, they should state with specificity the number of shifts during which they recall missing rest breaks and the circumstances that prevented them from taking the breaks. Claim forms for rest breaks must be

10

1  submitted by the close of the opt-out period for the class, or the claims will be forfeited.  The

2  class notice must inform class members of that deadline.

3         **C.**      **Split Shifts.**

4         Paragraph 2(R) of IWC Wage Order No. 5-2001 defines a "split shift" as "a work

5  schedule [for a single day] which is interrupted by non-paid non-working periods established by

6  the employer, other than bona fide rest or meal periods."  Paragraph 4(C) provides for premium

7  wages for certain split shifts, "[w]hen an employee works a split shift, one hour's pay at the

8  minimum wage shall be paid in addition to the minimum wage for that workday, except when

9  the employee resides at the place of employment."  Additionally, an employer will not be liable

10  for premium wages for split shifts if the total amount paid to the employee in question is at least

11  the minimum wage for all hours worked plus one hour.  *Aleman v. AirTouch Cellular*, 209 Cal.

12  App. 4th 556, 576 (2012).

13         The wage order does not define "bona fide rest or meal periods."  A DLSE opinion letter

14  stated that a bona fide meal period "is one that does not exceed one hour (60 minutes) in

15  length."  Opinion Letter from H. Thomas Cadell, Jr. to Paul K. Schrieffer, DLSE, Dec. 11, 2002

16  (Chao Decl., Exh. 2).  DLSE letters are not binding statements of the law.  *Areso v. CarMax,*

17  *Inc.*, 195 Cal. App. 4th 996, 1007–08 (2011).  Nevertheless, this order need not address whether

18  premium wages may be due for split shifts with interruptions shorter than one hour because

19  Saechao does not challenge McCormick & Schmick's failure to pay premium wages in such

20  circumstances.

21         McCormick & Schmick configured the timekeeping system at Spenger's to

22  automatically pay premium wages to any employee who worked consecutive shifts in a single

23  day with a break of ninety minutes or more between shifts (Cohorn Decl., Exh. N at

24  SPENGERS006581).  Management at Spenger's testified that this configuration (rather than

25  sixty minutes) avoided paying premium wages to employees who were scheduled to work

26  consecutive shifts less than sixty minutes apart but who clocked in later than sixty minutes after

27  clocking out (which might occur due to tardiness, for example).  Managers could manually

28

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    arrange for the payment of premium wages for so-called "split shifts" with a break of less than

2    ninety minutes by submitting an adjustment worksheet, and McCormick & Schmick's policy

3    was to do so for split shifts with interruptions between sixty and ninety minutes (Jasso Dep. at

4    108–09).

5           In December 2014, a regional leader at McCormick & Schmick reminded management

6    at Spenger's (among other restaurants) to record any split shift for which an employee

7    volunteered in the shift notes for that day so McCormick & Schmick could avoid paying

8    premium wages for voluntary split shifts.  The record does not indicate when McCormick &

9    Schmick began recording voluntary split shifts in shift notes except to the extent that the

10   December 2014 announcement was a "reminder" (Cohorn Decl., Exh. I at SPENGERS005230).

11          McCormick & Schmick argues that because premium wages are only due when split

12   shifts are "established by the employer," premium wages are not available where an employee

13   volunteered for or requested a split shift, so the circumstances surrounding each individual split

14   shift will predominate.  It cites *Leighton v. Old Heidelberg, Ltd.*, 219 Cal. App. 3d 1062, 1074

15   (1990), as support for the position that voluntary split shifts do not warrant premium wages.  In

16   *Leighton*, the plaintiff requested split shifts in order to accommodate her personal convenience

17   and family commitments.  Upon making that request, she signed an affidavit concerning split

18   shifts and waiving her right to premium pay.  At the trial court, the plaintiff averred that the

19   affidavit she signed was false and that her employer forced her to sign it as a condition of

20   employment.  The issue on appeal was whether plaintiff's declaration challenging the validity

21   of the affidavit raised a trial issue of fact precluding summary judgment.  The court of appeal

22   decided that it did not.  *Leighton* did not directly address the underlying validity of a waiver of

23   premium pay for split shifts or whether volunteering for split shifts automatically waives any

24   entitlement to premium wages.  It appears, however, that the California Court of Appeal

25   assumed the validity of such waivers as a critical step in reaching its conclusion.

26          In response, Saechao cites *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 405 (C.D. Cal.

27   2008) (Judge A. Howard Matz), aff'd 375 Fed. Appx. 734 (9th Cir. 2010), for the position that

28                                                    12

United States District Court

For the Northern District of California

an employer must pay premium wages even for voluntary split shifts.  That decision certified a class to pursue claims for split shifts and distinguished *Leighton* on the basis that it did not decide the question of whether a split shift could be "established by the employer" even if an employee voluntarily requested that shift.  *Id.* at 405 n.8.  *Kamar* held that even if an employee requested a particular split shift, the employer retained the discretion to deny the request, and thus, the scheduled split shift remained "established by the employer."

Thus, a threshold legal issue in this case will be whether *Kamar* correctly held that even voluntary split shifts warrant premium wages — a legal question capable of resolution on a class-wide basis.  If *Kamar* proves to be the correct statement of the law, then no inquiry into the circumstances of individual split shifts will be necessary, and McCormick & Schmick will be liable for one hour of pay at the minimum wage for *every* set of consecutive shifts with a scheduled interruption longer than sixty minutes, provided that the employee in question did not earn a total of the minimum wage for all hours worked plus one (which can be determined through a simple review of McCormick & Schmick's payroll records).

If, on the other hand, McCormick & Schmick's reading of *Leighton* is correct, our case will turn to the consideration of whether particular shift schedules were requested by employees or assigned by the employer.  Ordinarily, this would be an individualized question that might be fatal to class certification, but here, there is sufficient evidence for a jury to determine that McCormick & Schmick instructed management at Spenger's to keep a record of all voluntary split shifts in the shift notes for a given day.  If Saechao establishes that McCormick & Schmick implemented that policy at Spenger's, then the absence of such records in the shift notes will be a common method of proof to establish McCormick & Schmick's liability.  If individual issues become predominant as the case develops, this class may be decertified.[3]

---

[3]  McCormick & Schmick responds that management at Spenger's never assigned split shifts except upon request.  That is a defense that may be raised in rebuttal to Saechao's contentions regarding shift notes and that can be evaluated on a class-wide basis.

United States District Court

For the Northern District of California

1    McCormick & Schmick argues that Saechao's split-shift claims are not typical of those

2    of the rest of the putative class because she only worked split shifts while participating in a

3    promotional training program (Saechao Dep. at 420).  This is another distinction without a

4    difference.  McCormick & Shmick's policy applied the same to Saechao's split shifts during the

5    promotional program as it did to any other employee's split shifts.

6        Accordingly, Saechao has established that common questions will predominate in the

7    adjudication of the claims of the split-shift class and that her claims are typical of that class.

8                           **D.    Waiting Periods.**

9        Section 203(a) of the California Labor Code provides that "[i]f an employer willfully

10   fails to pay, without abatement or reduction . . . any wages of an employee who is discharged or

11   who quits" on the employee's last day of work or within seventy-two hours of quitting, the

12   wages shall accrue as a penalty up to a maximum of thirty days.  Saechao contends that any

13   member of the meal-break, rest-break, or split-shift classes who has quit or been terminated

14   from work at Spenger's is entitled to penalty payments pursuant to Section 203(a).  McCormick

15   & Schmick does not address the proposed waiting-periods class at all in its brief.  The claims of

16   this class are derivative of the meal-break, rest-break, and split-shift classes, although the

17   question of McCormick & Schmick's "willfulness" will need to be determined separately for

18   this class.  That can easily be done with common proof, namely, testimony regarding the state

19   of mind of Spenger's management.  The remote possibility that their intent changed over the

20   class period possibly could lead to a decertification of this class.

21       Saechao was terminated from her position in November 2014, after a fellow employee

22   reported to the general manager that Saechao had used a derogatory term to refer to another

23   employee (Villarreal Dep. ¶ 25).  Neither Saechao nor any other former employee received any

24   premium wages for split shifts, missed meal breaks, or missed rest breaks upon termination or

25   after quitting.

26       Common questions will predominate the adjudication of the claims of the members of

27   the proposed waiting-period class, and Saechao's claims are typical of those of the class.

28                                        14

United States District Court

For the Northern District of California

### E.   Wage Statements.

Section 226(a) of the California Labor Code provides that employers must "furnish" wage statements to employees "either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash . . . ." (The detachable part of the check ensured the employee could retain the wage statement, rather than depositing it along with the paycheck.)  The wage statement must state, *inter alia*, "the name and address of the legal entity that is the employer . . . ." Cal. Labor Code § 226(a)(8). Employees that suffer an injury as a result of "knowing and intentional failure" with regard to Section 226(a) may collect actual damages or statutory damages totaling fifty dollars for the initial violation and one hundred dollars for each violation in a subsequent pay period up to an aggregate penalty of four thousand dollars.  Cal. Labor Code § 226(e).  Section 226(e)(2) provides that an employee is deemed to suffer injury if an employer fails to provide a wage statement or fails to provide accurate and complete information on the wage statement.

McCormick & Schmick used three different mechanisms to pay their employees: (i) direct deposit, (ii) employee-issued debit cards (known as "pay cards"), or (iii) live checks. Employees that received direct deposits or pay cards had to affirmatively request copies of their wage statements, which could result in waiting months before receiving a statement. Throughout her time at Spenger's, Saechao received her pay via live checks.  The checks she received never contained the name and address of her employer on a detachable sheet attached to the check.  Checks generally included McCormick & Schmick's name and address on the checks themselves (although two included the name and address of Claim Jumpers Restaurants), but the detachable sheet attached to the checks only included the name and address of McCormick & Schmick's parent company, Landry's, Inc. (Cohorn Decl., Exhs. O, P, W).

Saechao seeks to certify a class to bring claims based on McCormick & Schmick's failure to provide wage statements to employees that received payment via direct deposit or a

pay card and its failure to include its accurate name and address on wage statements provided to individuals that received live checks.

McCormick & Schmick's primary argument with regard to this class is that Saechao never received her payment by direct deposit or a pay card, so her claims cannot be typical of the class. Indeed, because Saechao has not been experienced McCormick & Schmick's alleged failure to "furnish" a wage statement, she lacks standing to pursue that claim on behalf of herself or on behalf of the class. That lack of standing is fatal to her attempt to certify a class on that theory. Saechao seeks leave to add a new lead plaintiff who would have standing with regard to that theory. The deadline to add new parties was August 31, 2015. Saechao's request is five months too late, and she has made no effort to explain her failure to timely seek leave to add a new party despite this obvious shortcoming in her class certification motion. Accordingly, the wage statement class will be limited to those employees who, like Saechao, received live checks.

As to the live checks, besides arguing on the merits that its wage statements conformed to the requirements of Section 226(a), McCormick & Schmick argues that Saechao only submitted her own wage statements in support of her motion and that the Court should not consider wage statements from other employees submitted with her reply. McCormick & Schmick does not dispute that it used a common format for wage statements across all employees at Spenger's during the class period, nor does it argue that Saechao's submission of reply evidence caused any unfair prejudice.

Saechao should have submitted the pay stubs from other employees in support of her motion, rather than waiting for her reply, but it does not appear that Saechao withheld that evidence as a form of sandbagging. Rather, Saechao states that she omitted the other wage statements in order to avoid burdening the Court with additional evidence of McCormick & Schmick's uniform wage statement formats. This order considers the additional wage statements submitted by Saechao and finds that common questions regarding whether McCormick & Schmick's uniform wage statements conformed to the requirements of Section

16

226(a) will predominate the claims of Saechao's proposed class and that her claims relating to the form of the wages statements provided in conjunction with live checks are typical of those of the members of the proposed class.

**2.   ADEQUACY.**

The only remaining issue is whether Saechao and her counsel can "fairly and adequately" protect the interests of the putative classes, as required by Rule 23(a)(4).

**A.   Saechao.**

McCormick & Schmick argues that certain credibility issues disqualify Saechao from serving as class representative in this case. The following exchange occurred during the first day of Saechao's deposition (Saechao Dep. at 112):

> Q. Okay. On how many occasions did it happen that you feel you were entitled to a meal break and you did not get one?
>
> A. Hmm. Maybe three, four times.
>
> Q. Three to four times over the course of your employment?
>
> A. Yes.
>
> Q. Okay. So on three or four occasions over the course of your employment, you feel that you were denied a meal period in violation of [the meal-break policy]?
>
> A. Yes.

Later that day, Saechao sought to clarify her testimony (*id.* at 212):

> Q. Okay. All right. Now, what was it you wanted to say?
>
> A. I wanted to clarify earlier when you had asked me if I was at — if I asked for a break or was I denied a break. I was kind of confused when you said if I was given a break and I denied it or if I was asking for a break and was denied. I was —
>
> Q. So what did you want to say?
>
> A. That I just wanted to clarify it.
>
> Q. What do you want to clarify?
>
> A. The dates — I mean, the estimated time, the days that I had given you.

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1

2

Q.  So what days — what did you say before, and what do you want to say now?

3

A.  What I had said earlier when you had asked me, okay, when I was denied a break, how many times was I denied a break.

4

Q.  Right.

5

6

A.  And I told you pretty much the denial was when I was — when I asked them for a break, they denied me.

Q.  Right.  Okay.  And the testimony you gave earlier was truthful, right?

7

8

A.  Correct.

9

Q.  Okay.  So what are you trying to change now?

10

11

A.  To clarify that I did say that when you had asked — like when I was — when I was given — if I got a break and I denied it, or did I receive a break, or I asked for a break and was denied.

12

Q.  Right.

13

14

A.  And then you asked "Well, was the break provided to you, or did you get a break?"  So I was kind of confused there, as you could see.  I was still —

15

Q.  I still am confused as to what you're trying to clarify.

16

17

A.  Earlier today when you had asked me if they provided a break to me or did I get denied for a break when I was asked —

18

Q.  Okay.  What believe I asked you was whether you had ever asked for a break where it was denied, right?

19

A.  Yes.

20

Q.  Okay.  And that's what you answered, correct?

21

A.  Yes.

22

Saechao subsequently modified her testimony regarding how often she was denied a meal break

23

as follows (Saechao Dep. at 112) (as modified):

24

25

Q.  Okay.  On how many occasions did it happen that you feel you were entitled to a meal break and you did not get one?

26

27

A.  Hmm.  I was "denied" a meal break, meaning I asked for one and was told no maybe three, four times, each week.  I thought I should get a meal break whenever I worked, but I never got one.

28

18

Q.  Three to four times over the course of your employment?

A.  Yes, but I never got meal breaks ever.

Q.  Okay.  So on three or four occasions over the course of your employment, you feel that you were denied a meal period in violation of [the meal-break policy]?

A.  Yes, but during the whole time I worked there I never got a half hour meal break.

McCormick & Schmick contends that Saechao's testimony presents credibility issues because even after Saechao modified her testimony, it remains unclear how frequently she *asked* for meal breaks and was denied them.  As the Court reads the testimony, it seems clear that Saechao intended to testify that she never received a full thirty-minute meal break at all and that she expressly asked for a meal break and was expressly denied it three or four times in the course of her employment.  The confusion in her response resulted from the ambiguity in the form of counsel's question, namely, that counsel started the by asking how often Saechao felt she was "entitled" to a meal break but "did not get one" then pivoted to ask about when she was "denied" a meal break.  Saechao's testimony does not reveal any significant credibility issues.

McCormick & Schmick further contends that Saechao's testimony regarding time she took to call her children during each shift reveals additional credibility issues.  Saechao testified that she never took a ten-minute rest break during her employment.  As set forth above, she also testified that she never received a meal break.  Nevertheless, she testified that she took five to ten minutes each shift to check on her children.  Saechao clearly testified that any time she checked on her children she clocked out and that she was never able to clock out for a full thirty-minute meal break.  This testimony is consistent with her testimony that she never received a paid ten-minute rest break or a full thirty-minute meal break and does not raise adequacy-of-representation issues (Saechao Dep. at 2, 7, 13, 341–342).

Saechao testified at her deposition that a particular co-worker frequently worked off-the-clock while that co-worker averred she only worked off-the-clock a few times briefly (*compare*

Saechao Dep. at 37 *with* Mymala Decl. ¶ 17).  This exaggeration regarding an irrelevant issue does not disqualify Saechao as a class representative.

This order finds that Saechao has demonstrated that she is adequate to serve as a class representative.

**B.    Counsel.**

Rule 23(g)(1)(A) provides that in appointing class counsel, the following factors must be considered:

> (i)  the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class . . . .

"[A]ny other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class" may also be considered. Rule 23(g)(1)(B).  Saechao asks that her counsel, Attorney Cari A. Cohorn of Cohorn Law and Attorney Katharine Chao of Chao Legal should be appointed as class counsel.

There is no dispute that Saechao's counsel have worked diligently to identify potential claims, thoroughly understand knowledge of the applicable law.  Although Attorney Cohorn and Attorney Chao each appear to be the only attorneys in their respective law firms, there is no indication that they lack the resources necessary to adequately represent the putative classes (nor does McCormick & Schmick raise any objection as to this factor).

McCormick & Schmick argues that Attorney Cohorn and Attorney Chao should not be appointed because Attorney Chao has never been class counsel before and has primarily worked on the defense side.  Attorney Cohorn has litigated numerous wage-and-hour matters on both sides, and she has been appointed as class counsel as the second chair.  Although Attorney Chao is hardly inexperienced, Attorney Cohorn's experience will fill in any gaps in knowledge regarding plaintiff's side class action litigation.

This order holds, in light of counsel's zealous and effective advocacy for their client and their experience with litigation, albeit on the defense side, that Attorney Cohorn and Attorney Chao shall be appointed class counsel, with Attorney Cohorn to serve as lead counsel.

**3.    SUPERIORITY OF CLASS LITIGATION.**

Rule 23(b)(3) requires the consideration of four factors in assessing superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Here, the putative class members are mostly minimum-wage workers without the resources to pursue individual claims. "In light of the small size of the putative class members' potential individual monetary recovery, class certification may be the only feasible means for them to adjudicate their claims. Thus, class certification is also the superior method of adjudication." *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 515 (9th Cir. 2013). All class members worked at a single restaurant in Berkeley, which is within this district. This order finds that a class action is superior to individual actions for the classes certified in this order.

**4.    EVIDENTIARY ISSUES.**

McCormick & Schmick contends that the declarations of the putative class members used improper electronic signatures because she failed to include a filer's attestation of the declarants' signatures as required by Civil L.R. 5-1(i)(3). Generally, a filer's attestation serves to affirm the signatory's concurrence in the filing of a document where typed text appears in lieu of a signature. Here, the declarants included digital signatures provided through a third party, DocuSign, which signatures can generally be verified on the original versions of the documents signed. Although Rule 5(d) allows a court to adopt local rules allowing papers to be signed "by electronic means that are consistent with technical standards established by the

United States District Court

For the Northern District of California

1  Judicial Conference of the United States," our district has not adopted a local rule permitting

2  digital signatures absent a filer's attestation.  In any case, because counsel filed the declarations

3  of the putative class members (besides Saechao) as a single compiled document, rather than as

4  individual files, the digital signatures could not be verified.  Thus, even if the digital signatures

5  could be accepted in this district, those signatures were invalid.  Accordingly, certification

6  pursuant to this order is conditioned on Saechao's filing of a filer's attestation relating to any

7  declaration signed with a digital signature.  Saechao shall submit the signatures and attestations

8  by **March 18, at Noon**.

9         McCormick & Schmick objects to certain exhibits to the declaration of Attorney Cohorn

10  on the basis that she has failed to lay a proper foundation for the admissibility of those

11  documents.  Because McCormick & Schmick objected to the admissibility of these documents,

12  the Court reviewed each one of them and overruled the objections.  All of them are records

13  created by McCormick & Schmick and will very likely be admissible at trial.  The Court is

14  disappointed that McCormick & Schmick would raise such weak objections and require a

15  document-by-document review by the Court.  McCormick & Schmick's objections to Exhibits

16  I, J, N, O, P, W, X, and Y of Attorney Cohorn's declaration are **Overruled**.

17         Any documents not referred to above were not necessary to this order.  The parties'

18  respective evidentiary objections regarding those documents are **Overruled as moot**.

19                                    **CONCLUSION**

20         For the reasons stated above, the following five classes are hereby **Certified**, on the

21  condition that Saechao files proper digital signatures or filer's attestations by **March 18, at**

22  **Noon**:

23         1.      All hourly, non-exempt employees and former employees at
                   Spenger's Fresh Fish Grotto in Berkeley, California, who
24                 signed a meal-break waiver, who worked a shift of more
                   than five hours but no more than six hours, who were not
25                 provided with an off-duty meal break of at least thirty
                   minutes, and who were not paid premium pay for said un-
26                 provided meal break in accordance with Sections 226.7 and
                   512 of the California Labor Code and Paragraph 11 of IWC

27

28
                                        22

Wage Order No. 5-2001 from February 23, 2011, up to February 23, 2015

2. All hourly, non-exempt employees and former employees at Spenger's who worked a shift of at least three and one half hours in length who were not provided with at least one ten-minute, off-duty rest break for every four hours worked or major fraction thereof, and who were not paid premium pay for said un-provided rest break in accordance with Section 226.7 of the California Labor Code and Paragraph 12 of IWC Wage Order No. 5-2001 from February 23, 2011, up to February 23, 2015.

3. All hourly, non-exempt employees and former employees at Spenger's who worked multiple shifts in a single day separated by more than sixty minutes but not more than ninety minutes who were not paid premium pay for said split shifts in accordance with Paragraph 4(C) of IWC Wage Order No. 5-2001 from February 23, 2011, up to February 23, 2015.

4. All hourly, non-exempt former employees at Spenger's who resigned or were terminated between February 23, 2012, and February 23, 2015, and who are members of the meal-break or rest-break classes.

5. All hourly, non-exempt employees and former employees at Spenger's who received live checks from Spenger's that did not include the name and address of McCormick & Schmick Restaurant Corporation on a detachable form from February 23, 2014, up to February 23, 2015.

Plaintiff Mouang Saechao is hereby **APPOINTED** class representative.  Her counsel, Attorney Cari A. Cohorn and Attorney Katharine Chao are **APPOINTED** class counsel, with Attorney Cohorn to serve as lead counsel.

By **MARCH 31**, the parties shall jointly submit a proposal for class notification with a claim form for the rest-break class, with the plan to distribute notice by **APRIL 14**.

**IT IS SO ORDERED.**

Dated:   March 15, 2016.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

23